UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

ALICE BERGER,                                    :
                                                 :
                        Plaintiff,               :
                                                 :
            v.                                   :        No. 5:16-cv-06557
                                                 :
COMMONWEALTH OF PENNSYLVANIA                      :
DEPARTMENT OF TRANSPORTATION,                     :
                                                 :
                        Defendant.               :

_____

**O P I N I O N**

**Defendant's Motion for Summary Judgment, ECF No. 32 – Granted**

**Joseph F. Leeson, Jr.**                                          **June 12, 2018**
**United States District Judge**


I.      **Introduction**

        In this case, Plaintiff Alice Berger, an equipment operator for Defendant Commonwealth

of Pennsylvania, Department of Transportation (PennDOT) asserts a series of sex and disability

discrimination claims against PennDOT. First, she alleges that PennDOT discriminated against

her on the basis of sex and retaliated against her for opposing sex discrimination when it

suspended her in August 2014 after she was accused of stealing a load of dirt from a work site.

Second, she alleges PennDOT subjected her to a hostile work environment when a PennDOT

foreman harassed her because of her sex. Third, she alleges that PennDOT maintains a bathroom

policy that has a disparate impact on female employees who work outdoors. Fourth, she alleges

that PennDOT discriminated against her on the basis of her disabilities—diverticulitis and Lyme

disease—when it failed to accommodate these conditions and that it retaliated against her for

seeking accommodations for these conditions. PennDOT has moved for summary judgment on each of these claims. For the reasons set forth below, PennDOT's motion is granted.

## II.     Background

### A.     Factual Background

The following facts, which are derived substantially from the parties' Statements of Facts, are either undisputed or interpreted in the light most favorable to Berger, the non-moving party.

#### i.     Berger's colleagues and chain-of-command

Berger was hired by PennDOT in 1991 as an equipment operator in Northampton County. Def.'s Statement of Undisputed Material Facts ("Def.'s Stat.") ¶ 1, ECF No. 32-2. The unit in which Berger works employs over fifty male equipment operators and three female equipment operators. Pl.'s Resp. to Def.'s Statement of Undisputed Material Facts and Pl.'s Counter-Statement of Material Facts ("Pl.'s Stat.") ¶ 123, ECF No. 35-1.

Berger worked within "District 5" of PennDOT. Denise Levchak was the Human Resources Officer for District 5. Pl.'s Stat. ¶ 124. Joseph Rhodomoyer was the Labor Relations Coordinator for District 5 and reported to Levchak in 2014. Pl.'s Stat. ¶ 125. In 2014, Shawn Campanaro was the Assistant County Maintenance Manager. Pl.'s Stat. ¶ 126.

#### ii.     Fred Farleigh's conduct

In 2013 and 2014, Fred Farleigh served as a foreman for PennDOT. Def.'s Stat. ¶ 15. A foreman's job is to coordinate PennDOT projects in the field and manage operators to execute the project's goals. Def.'s Stat. ¶ 16. Berger is Farleigh's cousin and she has known him since her childhood. Def.'s Stat. ¶ 18. Berger began encountering problems with Farleigh immediately after she began working under him. Def.'s Stat. ¶ 20. The problems included Farleigh's "yelling,

screaming, throwing his hands up, saying the Lord's name in vain" and "throwing his hands up in the air, turning around, [and] shaking his head" to express his disgust. Def.'s Stat. ¶ 21. In addition, Farleigh would intentionally antagonize Berger in various ways; for example, while Berger was operating machines, Farleigh would use incorrect hand signals to indicate what Berger was supposed to do and then reprimand Berger when she did things incorrectly. Def.'s Stat. ¶ 23. Farleigh also did not assign Berger certain overtime shifts. Def.'s Stat. ¶ 26. Although he would say critical things about and use inappropriate language towards others, he was especially loud and impatient with Berger and directed more inappropriate language to her than to others. *See* Pl.'s Stat. ¶ 22. Berger believes that Farleigh acted this way toward her based on her sex because, although she was the only woman operating the equipment, Farleigh did not seem to treat the male operators the same way. Def.'s Stat. ¶ 25.

### iii. Berger's discrimination and harassment complaint against Farleigh

Around March 4, 2014, PennDOT received a class grievance filed by the AFSCME Council 13 union alleging "harassment and/or discriminatory treatment" by Farleigh toward the operators working under him. Def.'s Stat. ¶ 34. On April 3, 2014, Berger called the PennDOT TipLine alleging that Farleigh created a hostile work environment and discriminated against her because she is a woman. Def.'s Stat. ¶ 35. Shortly after Berger called the TipLine—perhaps a "couple of weeks" after—Farleigh was removed from any assignment as Berger's foreman. Def.'s Stat. ¶ 49.

Joseph Rhodomoyer conducted PennDOT's investigation of Berger's complaint and the class grievance against Farleigh. Def.'s Stat. ¶ 37. The record contains a number of witness statements dated in May 2014, which reveal a variety of opinions regarding Farleigh's conduct; for example, some believed he treated women unequally, while others thought he simply had

"anger issues." Def.'s Stat. ¶ 38. On April 10, 2014, Berger wrote a statement describing a recent dispute she had with Farleigh and providing additional allegations about Farleigh's treatment of other female PennDOT employees. Def.'s Stat. ¶ 41. Also on that date, she met with Rhodomoyer and Levchak concerning her complaints against Farleigh. *See* Pl.'s Stat. ¶ 41.

On May 27, 2014, Farleigh was informed via a "Pre-Disciplinary Conference" memorandum that he was suspected of inappropriate behavior and violating the harassment and hostile work environment policy. Def.'s Stat. ¶ 43. On June 24, 2014, Farleigh signed a "Pre-Grievance Settlement Agreement and Release," in which he agreed to serve a one-day suspension for his conduct and "attend some form of leadership, supervisory, or employee relations training." Def.'s Stat. ¶ 44.

### iv.    The events of June 24 and 25, 2014

On June 24 and 25, 2014, Berger was working for foreman Terry Nasatka on a site along Route 611 near Easton, Pennsylvania, laboring and hauling dirt from the PennDOT work site to the designated dump site on Hackett Hill. *See* Def.'s Stat. ¶ 52. On June 24, 2014, Berger hauled multiple loads of dirt from the work site to the dump site. Def.'s Stat. ¶ 55. Berger testified that the dirt was not topsoil, but rather consisted of "leaves, limbs, garbage, a tire, tire-parts, a lot of debris . . . . and rocks." Pl.'s Stat. ¶ 55.

The following day, June 25, Nasatka told Berger around 1:00 p.m. to "go dump off and get lost." Def.'s Stat. ¶ 56. Berger understood "dump off and get lost" to mean that she should dump her last load of the day but she should not return to the stockpile—the location where she starts and ends each day—any earlier than 2:45 p.m. Def.'s Stat. ¶ 57. Leaving the work site, Berger drove north on Route 611 toward Lafayette Street. Def.'s Stat. ¶ 58. Berger intended to make the next left turn at Frost Hollow Road, which would allow her to proceed southwest back

toward the dump site, but she missed that turn. Def.'s Stat. ¶ 59. Berger proceeded to Frutchey

Hill Road—approximately 3.5 miles north of Lafayette Street—where she claims she turned left.

Def.'s Stat. ¶ 60. In between Frost Hollow Road and Frutchey Hill Road, Berger passed another

PennDOT work site where Farleigh was foreman. Def.'s Stat. ¶ 61. Berger lived at 480

Evergreen Road in Mount Bethel, Pennsylvania, which was north of her work site and north of

Farleigh's work site, just off Route 611. Def.'s Stat. ¶ 62. As Berger drove by Farleigh's work

site, she thought to herself "he's probably going to say I am taking this dirt home," since she was

driving in the direction of her home, Farleigh knew where she lived, and he "was always blaming

[her] for things." Berger Dep. 171:12-172:5, Def.'s Mot. Ex. A, ECF No. 32-3. Farleigh

contacted his supervisor, Shawn Campanaro, and reported that at approximately 1:30 p.m. he

saw Berger driving a PennDOT vehicle loaded with dirt northbound on Route 611. Def.'s Stat.

¶ 63.

   Berger claims that she turned off Route 611 onto Frutchey Hill Road, and that she

proceeded to the dump site via Richmond Road and Elizabeth Avenue. Def.'s Stat. ¶ 67. Berger

did not know the exact amount of time it takes to go from Frutchey Hill Road to the dump site,

but she would not dispute that it would take about fifteen minutes. Def.'s Stat. ¶ 68. Berger

estimates that she spent three minutes at the dump site. Def.'s Stat. ¶ 69. Berger claims she drove

from the dump site back to Martin's Creek, where she reconnected with Route 611 and headed

home. Def.'s Stat. ¶ 70. Berger began having stomach and bowel issues off-and-on during her

drive, and she had a stomach-and-bowel-related accident sometime after turning onto Frutchey

Hill Road; after she visited the dump site, she proceeded home to clean up and change clothes.

Def.'s Stat. ¶ 71.

v.    **PennDOT's investigation of Berger**

After receiving Farleigh's report about Berger's activities on June 25, Campanaro sent an email to his superior, Rodney Vanscavish, that same day, stating that Farleigh had seen Berger drive by his work site with a load on her truck, and that he (Farleigh) later drove by Berger's house and saw tire tracks in her yard. *See* Def.'s Stat. ¶ 72; Def.'s Mot. Ex. A at PENNDOT 003050, ECF No. 32-9. Vanscavish forwarded Campanaro's email to Rhodomoyer. Kovatis Decl. Ex. A at PENNDOT 003050. Approximately forty minutes later, Campanaro sent Vanscavish another email, attaching several pictures that he had taken of Berger's driveway area and writing "[y]ou can clearly see du[al] tire marks coming from her driveway." *See* Pl.'s Stat. ¶ 189; Pl.'s Resp. Ex. 90 at PENNDOT 003669, ECF No. 35-24. Vanscavish also forwarded this email to Rhodomoyer. Pl.'s Resp. Ex. 90 at PENNDOT 003669.

The next day, June 26, Rhodomoyer sent Vanscavish an email, writing: "Thanks, that's not much evidence . . . we'll get a statement from Fred [Farleigh] and try to get a confession?" *Id.* That same day, Campanaro emailed to Vanscavish a picture of Berger's house, writing, "[h]ard to see but there is a fresh pile of dirt and rocks behind the white building." *See* Pl.'s Stat. ¶ 191; Pl.'s Resp. Ex. 85 at PENNDOT 002860-61, ECF No. 35-23. Campanaro later testified under oath that he saw on Berger's property two dirt piles that had grass growing on them and two dirt piles with no grass growing on them near a little shed, but that the two fresh piles of dirt were not visible in the picture he took. *See* Pl.'s Stat. ¶ 193.

Rhodomoyer and Levchak were responsible for investigating Farleigh's allegations against Berger. Pl.'s Stat. ¶ 194. As part of the investigation, Rhodomoyer reviewed Automatic Vehicle Location (AVL) data from Berger's PennDOT vehicle. The AVL is a location device that "pings" a location for the vehicle, providing a GPS location. The AVL data show that on

June 25, Berger's truck was pinged at the work site from 11:57 a.m. to 12:25 p.m.; on Route 611 from 1:31 p.m. to 1:44 p.m.; and then at her home from 2:06 p.m. to 2:31 p.m. *See* Pl.'s Resp. Def.'s Stat. ¶ 75. But the data also show that at 1:44 p.m. she was both at her home and on Route 611—an impossibility. *See id.* There are no AVL pings for Berger's truck at the dump site on June 25; Rhodomoyer testified that this indicates that Berger never visited the dump site on that date. Rhodomoyer Dep. 166:24-167:10, Def.'s Mot. Ex. B. ECF No. 32-5. Rhodomoyer further testified that he regarded the GPS data as the only "clear and convincing" evidence to support a finding of Berger's guilt, and that the rest of the evidence "would have been circumstantial." *Id.* at 176:23-177:1.

Berger had a problem with the AVL device on her truck sometime on June 24 or 25, causing her radio to indicate "No MRU" at various times. Def.'s Stat. ¶ 80. During his investigation, Rhodomoyer learned that "No MRU" most likely meant that the radio lacked sufficient power, which would affect the GPS signal. *See* Def.'s Stat. ¶ 81. Berger's foreman and co-worker verified that Berger made trips to the Hackett Park dump site on June 24—none of which appear on the AVL map data. *See* Pl.'s Stat. ¶ 239. Rhodomoyer testified that despite the "No MRU" problem, he still believes that the GPS data provided clear and convincing evidence of Berger's guilt "[b]ecause absence of information is not the same thing as when the information is—is active. So there was active GPS that produced a timeline . . . . When the GPS was working, it's clear and evident." Rhodomoyer Dep. 186:4-15.

On July 10, 2014, PennDOT held a Pre-Disciplinary Conference concerning Berger's alleged theft. Def.'s Stat. ¶ 87. During the conference, Rhodomoyer asked Berger if she had dumped the material before she went to her house, and she responded "yes, anyway, I wouldn't want that dirt it has broken bottles." Pl.'s Stat. ¶ 217. Berger was shown a picture of her property

that had been taken by Campanaro; she explained that the picture was of a tarp covering a log splitter, not a pile of dirt. Pl.'s Stat. ¶ 219.

A second Pre-Disciplinary Conference was held on July 16. Def.'s Stat. ¶ 88. At that hearing, Rhodomoyer told Berger that PennDOT had evidence showing that she had dumped a load of dirt at her home on both June 24 and 25. Pl.'s Stat. ¶ 229. But at Rhodomoyer's deposition for this case, he testified that he had "never concluded" that Berger stole multiple loads of dirt. Pl.'s Stat. ¶ 230.

On August 6, 2014, Rhodomoyer emailed Sara VanderGheynst, a PennDOT human resources official, a request for Berger's removal along with supporting documents. Def.'s Stat. ¶ 89. The request stated that Berger "was witnessed going to her house with Department equipment and a load of dirt" and "was also tracked on the AVL being at her house, at the work location, and stockpile but never at the site where the dirt should have been dumped." *Id.*

Denise Levchak relied on the investigation conducted by Rhodomoyer, and she agreed with his conclusion that Berger should be terminated. Pl.'s Stat. ¶ 265. Levchak agreed with this conclusion despite knowing that: (a) PennDOT did not have detailed location data from Berger's truck when it made the decision to fire her; (b) Farleigh's statement is the only statement PennDOT had that suggested Berger stole dirt; (c) Berger claimed that the AVL system was not working in her vehicle. Pl.'s Stat. ¶ 267.

Berger was suspended pending investigation effective August 12, 2014. Def.'s Stat. ¶ 90. On August 18, 2014, Sherry Norris, Bureau of Human Resources Director, sent a memo to Bradley Mallory, Executive Deputy Secretary for Administration, requesting Berger's dismissal. Def.'s Stat. ¶ 91. Berger was terminated on August 21, 2014. Def.'s Stat. ¶ 92.

### vi.     Berger's grievance

Berger filed a grievance challenging her termination—as she was entitled to do as a union member—contending that she did not commit theft. Def.'s Stat. ¶ 95. The grievance ultimately proceeded to the "East Joint Area Committee," which held a hearing before a panel of six that included three management representatives and three union representatives. Def.'s Stat. ¶ 96. The committee decided that "[b]ased on the facts presented, the Grievant's termination shall be converted to a long-term suspension without pay," and all six panel members signed the decision. Def.'s Stat. ¶¶ 99-100. Berger has no reason to believe that any of the Committee members were motivated by bias or discriminatory intent. Def.'s Stat. ¶ 101. Pursuant to the Committee's decision, Berger returned to work on March 10, 2015. Def.'s Stat. ¶ 107.

### vii.    Berger's disability claim

During her two Pre-Disciplinary Conferences in July 2014, Berger, for the first time, informed PennDOT that she had medical issues that caused her to have special bathroom needs. Def.'s Stat. ¶ 108. Berger later provided PennDOT with a letter from her physician dated August 14, 2014, which requested accommodations due to her diverticulitis and Lyme disease. *See* Pl.'s Stat. ¶ 110.

### viii.   PennDOT's bathroom policy and the "Counseling Session document"

PennDOT does not provide restrooms to operators in the field, although it does provide portable bathrooms at the stockpile—as mentioned above, the location where the operators start and end each day—which the equipment operators visit for ten to fifteen minutes each morning. *See* Def.'s Stat. ¶ 112; Pl.'s Stat. ¶ 112. In May 2014, Campanaro held a meeting with operators to discuss, among other things, their use of public bathrooms. *See* Def.'s Stat. ¶ 113. Berger

understood Campanaro's direction to mean that she was allowed to use public restrooms only where she could get fuel. Def.'s Stat. ¶ 114.

In October 2016, Berger asked Campanaro to provide her with a list of places where she is allowed to use the restroom because she was "tired of looking over her shoulder." Def.'s Stat. ¶ 117; Pl.'s Stat. ¶ 117. Campanaro responded by issuing her a "Counseling Session document," which indicated that Berger could use any public restroom provided that she notified her foreman that she was temporarily "out of service." Def.'s Stat. ¶ 118. The Counseling Session document states that "[a]though Counseling is not a recognized part of the disciplinary process, any future incidents of this nature, or of a similar nature, may result in disciplinary action." Pl.'s Stat. ¶ 119.

## B. Procedural History

Berger filed her initial Complaint in this matter in December 2016. ECF No. 1. After Berger filed a second charge with the Equal Employment Opportunity Commission in April 2017, the Court modified the Scheduling Order to permit Berger to amend her Complaint after receiving the Right to Sue Notice on the second charge. *See* ECF Nos. 14, 17. Berger filed her Amended Complaint in January 2018, asserting four claims of sex discrimination in violation of Title VII of the Civil Rights Act of 1964. Specifically, in Count I, Berger alleges that she was subjected to disparate treatment on the basis of sex; in Count II, she alleges that she was harassed on the basis of sex; in Count III, she alleges that PennDOT retaliated against her for her protected activity of opposing sex discrimination; and in Count IV she alleges that PennDOTs restroom policy had a disparate impact on her and other female employees. In addition, Berger asserts two disability discrimination claims: in Count V, she alleges that she was subjected to an adverse employment action because of her disability, in violation of § 504 of the Rehabilitation Act; and in Count VI, she alleges that PennDOT failed to reasonably accommodate her disability

and retaliated against her for requesting an accommodation, also in violation of § 504 of the Rehabilitation Act.

As mentioned above, PennDOT moves for summary judgment on each of Berger's claims.

## III.    Standard of Review

Summary judgment is appropriate if the moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if the fact "might affect the outcome of the suit under the governing law," and a dispute is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When the evidence favoring the nonmoving party is "merely colorable" or "not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted). The parties must support their respective contentions—that a fact cannot be or is genuinely disputed—by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c)(1).

## IV.    Analysis

For the reasons set forth below, PennDOT is entitled to summary judgment on each of Berger's claims.

## A.    PennDOT is entitled to summary judgment on Berger's claim of discrimination on the basis of sex.

Title VII of the Civil Rights Act of 1964 forbids employers "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). Because Berger has not

provided direct evidence of discrimination, the Court's inquiry is governed by the three-part framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03 (1973). Under the first step in the *McDonnell Douglas* analysis, a plaintiff must establish "by a preponderance of the evidence a prima facie case of discrimination." *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013). Second, if the plaintiff succeeds in making out a prima facie case, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for its decision, Third, if the defendant is able to provide such a reason, the plaintiff must then show that the proffered reason is merely a pretext for actual discrimination.

To establish a prima facie case of sex discrimination, a plaintiff must show that (1) she is a member of a protected class, (2) she was qualified for the position she sought to attain or retain, (3) she suffered an adverse employment action, and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination. *See Mandel*, 706 F.3d at 169. Here, PennDOT does not dispute that Berger meets the first three elements, but it argues that she cannot establish the fourth element because the adverse employment action did not occur under circumstances that could give rise to an inference of intentional discrimination. In particular, PennDOT argues that Berger has not shown that a similarly-situated employee was treated more favorably than she was, nor is there anything in PennDot's investigation of Berger that raises an inference that she was treated differently because of her sex.

Berger responds that "there are material facts in dispute and [she] satisfies all requirements for her *prima facie* claim of sex discrimination." Pl.'s Br. Opp'n 35, ECF No. 35. But, as PennDOT points out, Berger does not specify *which* material facts are in dispute or *how* such facts provide support for her prima facie case. *See* Def.'s Reply 2, ECF No. 36. Although

the burden on a plaintiff at the prima facie stage is not meant to be "onerous," and courts should be especially flexible when analyzing the inference-of-discrimination element, a plaintiff nevertheless must point to evidence of "some causal nexus" between her sex and the adverse employment action to establish that element. *See Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 798 (3d Cir. 2003). Berger has failed to do this and, accordingly, cannot establish a prima facie case of sex discrimination.

Even if Berger could establish a prima facie case of sex discrimination, thereby entitling her to proceed to the second and third stages of the *McDonnell Douglas* framework, she has failed to show that there is evidence in the record that PennDOT's proffered legitimate, nondiscriminatory reason for suspending her—namely, its belief that she stole a load of dirt— was a pretext for discrimination.

A plaintiff can demonstrate that the employer's legitimate, nondiscriminatory reason was pretextual by "point[ing] to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). The plaintiff's evidence, if it relates to the credibility of the employer's proffered justification, "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Id.* at 765 (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

Here, Berger argues that "PennDOT's biased investigation is evidence of pretext." Pl.'s Br. Opp'n 51. Her argument focuses on Rhodomoyer's conduct, contending that he "did not

conduct a good faith investigation into Ms. Berger's complaint against Mr. Farleigh and Mr. Farleigh's accusation of theft against Ms. Berger." Pl.'s Br. Opp'n 52.

At the outset, it is difficult to make sense of Berger's argument that Rhodomoyer's investigation of the harassment claims against Farleigh shows that Rhodomoyer was biased against Berger on the basis of her sex. It is undisputed that Rhodomoyer met with Berger about her complaints against Farleigh and that Farleigh was subsequently disciplined and removed from any assignment as Berger's foreman. Further, Rhodomoyer's conclusion that Farleigh "treats everybody poorly"—not just women—was reasonable in light of the evidence he collected, as the record shows that some employees felt that Farleigh had a general anger problem that was directed to all employees. *See* Rhodomoyer Tr. 68:10-13.

With respect to Rhodomoyer's investigation of the alleged theft, Berger asserts that he made "an assumption of [her] guilt" before finalizing the investigation. This assertion presumably refers to Rhodomoyer's June 26 email to Vanscavish, in which he wrote: "Thanks, that's not much evidence . . . we'll get a statement from Fred [Farleigh] and try to get a confession?" But Rhodomoyer's question simply indicates that he regarded the evidence against Berger as weak, and that he was wondering what the next steps of the investigation should be. It is undisputed that Rhodomoyer went on to gather additional evidence and that he testified that he regarded the GPS evidence as the strongest evidence of Berger's guilt.[1] Berger has pointed out certain problems with the GPS evidence. But Rhodomoyer was not the only PennDOT employee who found that, despite these apparent problems, there was sufficient evidence that Berger

---

[1]     Berger also contends that Rhodomoyer "significantly edited" the minutes from Berger's Pre-Disciplinary Committee meeting on July 16, 2014, but she does not describe the nature of the edits, nor does she explain how these edits showed bias on Rhodomoyer's part. *See* Pl.'s Br. Opp'n 55.

committed the theft. As discussed above, Denise Levchak was aware of all of the apparent GPS problems, and yet she agreed with Rhodomoyer's conclusion.

Based on the record before the Court, there may be doubt about the wisdom of PennDOT's decision to terminate an employee who served it for over twenty years on the basis of what appears to be questionable GPS data. However, the Court cannot say that Berger has presented evidence from which a rational factfinder could determine that PennDOT's legitimate, nondiscriminatory reasons for its decision were "unworthy of credence." Accordingly, even if Berger could establish a prima facie claim of discrimination, she is unable to show that PennDOT terminated her because of her sex.

**B. PennDOT is entitled to summary judgment on Berger's retaliation claim.**

Title VII prohibits employers from "retaliating against an employee for complaining about, or reporting, discrimination or retaliation." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 256 (3d Cir. 2017) (citing 42 U.S.C. § 2000e-3). Where, as here, a plaintiff seeks to prove a retaliation claim through indirect evidence, the *McDonnell Douglas* burden-shifting framework guides the court's inquiry. *See id.* "To state a prima facie case of retaliation, a plaintiff must show that (1) she engaged in a protected activity, (2) she suffered an adverse employment action, and (3) there was a causal connection between the participation in the protected activity and the adverse action." *Id.* With respect to the third element, a plaintiff "may rely on a broad array of evidence to demonstrate the causal link between the protected activity and the adverse employment action taken." *Id.* (internal quotation marks and alterations omitted). "She can meet this burden by proffering evidence of an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity unusually suggestive of retaliatory motive." *Id.* (internal citations and quotation marks omitted). "These are

not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Id.*

PennDOT does not dispute that Berger engaged in protected activity under Title VII when she reported Farleigh via the TipLine, nor does it dispute that she suffered an adverse employment action, but it contends that she cannot establish a causal relationship between the two events. At the outset, PennDOT argues that Berger cannot show an "unusually suggestive" temporal proximity between the two events because Berger was suspended more than four months after reporting Farleigh for harassment, which is too long to create an inference of causation. PennDOT acknowledges that only one day elapsed between the date on which Farleigh was notified of his one-day suspension and the date on which he reported Berger's alleged theft. But PennDOT argues that even if this close temporal proximity might be sufficient to show that *Farleigh* had a retaliatory motive when he reported her, this is not indicative of *PennDOT's* motive. Rather, PennDOT contends that Farleigh's report merely "got the ball rolling" on the investigation of Berger, that Farleigh played no role in the investigation after making his report, and that PennDOT relied on other evidence besides Farleigh's report in making its final determination. Further, PennDOT argues that, in any event, Berger admits that Farleigh's report was entirely accurate—he did, in fact, see Berger driving in the direction of her home with a load of dirt.

Berger responds that although Farleigh was not the decision-maker with respect to Berger's termination, PennDOT can be held liable for Farleigh's retaliation by virtue of what has become known as the "cat's paw" theory of liability, which applies when an employee's

unlawful animus influences a neutral decision-maker.[2] Specifically, Berger argues that a cat's paw claim may be shown if PennDOT decision-makers relied on Farleigh's report in deciding to terminate Berger.

Under the cat's paw theory of liability, an employer may be liable for employment discrimination "if the source of illegal animus was not the final employment decision-maker but rather another employee whose animus proximately caused the adverse employment action at issue in the case." *See Smith v. COMHAR, Inc.*, No. CV 15-4913, 2017 WL 930421, at *9 (E.D. Pa. Mar. 9, 2017), *aff'd*, 722 F. App'x 314 (3d Cir. 2018) (quoting *Mason v. Se. Pennsylvania Transportation Auth.*, 134 F. Supp. 3d 868, 874 (E.D. Pa. 2015)). Proximate cause "requires 'some direct relation between the injury asserted and the injurious conduct alleged' and excludes links that are 'remote, purely contingent, or indirect'" *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 330 (3d Cir. 2015) (quoting *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011)). Although the Supreme Court in *Staub* "declined to adopt a 'hard-and-fast rule' that an employer's intervening exercise of independent judgment (e.g., between the supervisor's biased report of employee wrongdoing and the termination of the employee) precludes a finding of proximate cause . . . . the Court did indicate that proximate cause will not exist when the employer does not rely on the 'supervisor's biased report' in taking the ultimate adverse action." *Id.* at 330-31 (quoting *Staub* at 421).

---

[2]     The term "cat's paw" derives from one of Aesop's fables in which "a mischievous monkey compliments his company, a cat, on his abilities and suggests that the cat steal the chestnuts that they were watching roast in a fire. The naïve cat, flush with the monkey's flattery, readily obliges. The cat proceeds to pluck the chestnuts from the flames, singeing his paws in the process, while the monkey snatches the chestnuts away." *See McKenna v. City of Philadelphia*, 649 F.3d 171, 177 n.6 (3d Cir. 2011) (citing *Staub*, 562 U.S. at 416 n.1).

Here, although it may be true that Farleigh's report was the but-for cause of Berger's termination, because it "got the ball rolling" on the investigation of the alleged theft, *see Jones*, 796 F.3d at 331, Berger cannot show that Farleigh's report was the proximate cause of her termination. This is primarily because the information he reported—namely, that he saw Berger driving in the direction of her home with a load of dirt—was accurate, as Berger admits. Although Farleigh himself may have been biased, he did not produce a "biased report," and the facts contained in his report were available independently of the report—namely, from Berger herself. For this reason, Farleigh's conduct was not a proximate cause of Berger's termination, and Berger is unable to succeed on a cat's paw theory of liability. Further, because there is no alternative theory under which Berger can show a causal connection between her protected activity and the adverse action, she is unable to establish a prima facie claim of retaliation, and her retaliation claim fails.

C.    **PennDOT is entitled to summary judgment on Berger's hostile work environment claim.**

PennDOT contends that Berger is also unable to establish a hostile work environment claim. First, PennDOT argues that Farleigh was not a "supervisor" for the purposes of Title VII and that, as a result, PennDOT can be held liable for his actions only if it was negligent with respect to the offensive behavior—that is, if it knew or should have known about his harassment but failed to take remedial action. According to PennDOT, there is no evidence that, prior to April 2014, it knew or should have known of any sexually harassing conduct by Farleigh and, once it did receive Berger's report of harassment, it promptly separated Farleigh from Berger and directed that Farleigh attend workplace civility training.

Berger responds that Farleigh was her supervisor because PennDOT's "organizational chart confirms equipment operators report to foremen" and that he was evaluated on his

"supervision" skills, and that PennDOT is therefore strictly liable for his harassment. Pl.'s Br. Opp'n 37. Further, she contends that even if Farleigh was not her supervisor, PennDOT's response to the multiple complaints about Farleigh's harassment was inadequate and negligent.

To establish a hostile work environment claim against an employer based on sexual harassment, an employee must prove that: (1) she suffered intentional discrimination because of her sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected her; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of respondeat superior liability. *Huston v. P&G Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009). With respect to the last element, "the basis of an employer's liability for hostile environment sexual harassment depends on whether the harasser is the victim's supervisor or merely a coworker." *Id.* "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013). But in cases in which the harasser is a "supervisor," different rules apply depending on whether the supervisor's harassment culminates in a "tangible employment action." *Id.* If there is a "tangible employment action," then the employer is strictly liable. *Id.* "But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.*

As indicated above, the parties dispute whether Farleigh was a "supervisor." "The U.S. Supreme Court has held that "an employee is a 'supervisor' for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions

against the victim." *Id.* A "tangible employment action" is "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).

Here, it is undisputed that Farleigh did not have the ability to fire Berger, to promote or not promote her, to reassign her, or to control her regular work hours. Although Berger contends that Farleigh supervised her work, by virtue of his duties as foreman, in *Vance* the U.S. Supreme Court specifically rejected a "more open-ended approach" to the definition of "supervisor" that "tie[d] supervisor status to the ability to exercise significant direction over another's daily work." *See Vance*, 570 U.S. at 431. Accordingly, Farleigh's supervisory responsibilities, alone, are insufficient to qualify him as a "supervisor" under Title VII.[3]

Because Farleigh was not a supervisor, Berger can hold PennDOT liable for his conduct only if she can show that it was negligent in controlling working conditions, which she cannot. It is undisputed that shortly after Berger reported Farleigh's conduct, PennDOT undertook an investigation, reassigned Farleigh to work sites separate from Berger's, and imposed discipline on Farleigh. *See Bumbarger v. New Enter. Stone & Lime Co.*, 170 F. Supp. 3d 801, 838 (W.D. Pa. 2016) ("When the employer's response stops the harassment, there can be no employer liability under Title VII as a matter of law.").

---

[3]    The parties' statements of facts discuss Farleigh's control over Berger's overtime hours, but Berger does not address this point in her brief, and the extent of this control is unclear from the record. In any event, showing that an employee has a limited amount of control of overtime hours does not, by itself, show that the employee is a "supervisor" for Title VII purposes. *See Francis v. Atlas Machining & Welding, Inc.*, No. CIV.A. 11-6487, 2013 WL 592297, at *6 (E.D. Pa. Feb. 15, 2013) ("Although there is some testimony that [the employee in question] occasionally allocated overtime . . . the parties have not pointed to any evidence that he possessed the authority to hire, fire, and discipline the staff he worked with." (internal quotation marks omitted)).

Further, even if Farleigh were a supervisor, Berger is unable to establish a hostile work environment claim. As discussed above, when a supervisor is the alleged harasser, a different analysis applies depending on whether or not harassment culminates in a tangible employment action. Here, although it is undisputed that Berger suffered a tangible employment action—namely, her suspension and termination—this action did not result from Farleigh's alleged harassment. Berger's suspension and termination occurred after Farleigh had been removed from working as her foreman and, as explained above, resulted from Rhodomoyer's investigation and his and Levchak's independent decision.

Because Farleigh's conduct did not culminate in a tangible employment action, PennDOT can invoke the *Ellerth/Faragher* defense (also known as the *Faragher/Ellerth* defense), whereby "[a]n employer can establish an affirmative defense to liability for a supervisor's creation of a hostile work environment by showing '(1) that it exercised reasonable care to prevent and promptly correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of any preventive or corrective opportunities that were provided.'" *Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 218 (3d Cir. 2017) (quoting *Vance*, 570 U.S. at 430). Here, it is undisputed that PennDOT maintained a policy for reporting discrimination—as illustrated by the results of Berger's April 2014 TipLine report of Farleigh. If Berger wanted to make a complaint prior to April 2014, her failure to do so was unreasonable. Accordingly, even if Farleigh was a supervisor, PennDOT can successfully invoke the *Ellerth/Faragher* defense in response to Berger's claims of harassment.

**D.** **PennDOT is entitled to summary judgment on Berger's disparate impact claim.**

PennDOT contends that it is entitled to summary judgment on Berger's disparate impact claim, most fundamentally because Berger has not clearly identified any specific employment practice that had a disparate impact on women.

Berger responds that "[t]here is substantial evidence from which a jury could find that PennDOT's facial neutral practice of requiring equipment operators to go to the bathroom outside . . . has a disparate impact on female employees." Pl.'s Br. Opp'n 42. As evidence for the existence of this policy, Berger cites a written statement from a coworker named Paul Romano, stating that "we have been told that we are allowed to use the bathrooms only at designated fuel stops and only if we had a fuel receipt. . . . This was per Shawn Campanaro." *See* Pl.'s Br. Opp'n Ex. 22 at PennDOT 000165, ECF No. 35-17. Berger also cites Campanaro's testimony that "I stated earlier that they couldn't use the bathrooms in public places or rest areas." *See* Pl.'s Br. Opp'n Ex. 6 at 581, ECF No. 35-13. Finally, she cites her own testimony that on one occasion she was denied the opportunity to use a restroom when she was at an interchange with Dave Heissler, a foreman: "[I said], hey, Dave I got to go to the bathroom. And he said go in the weeds there. . . . and I didn't argue with him." Berger Tr. 232: 4-24, Def.'s Mot. Ex. 3, ECF No. 32-3.

In a disparate impact claim, "[t]he plaintiff must begin by identifying the specific employment practice that is challenged." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 357 (2011) (internal quotation marks omitted). Thereafter, disparate impact claims proceed in two steps: (1) the plaintiff must prove that the challenged policy discriminates against members of a protected class, and then (2) the defendant can overcome the showing of disparate impact by proving a "manifest relationship" between the policy and job performance. *See Meditz v. City of Newark*, 658 F.3d 364, 370 (3d Cir. 2011). Because only equitable relief is available for

disparate impact claims, there is no right to a jury trial for such claims. *See Pollard v. Wawa Food Mkt.*, 366 F. Supp. 2d 247, 254 (E.D. Pa. 2005).

Berger's disparate impact claim fails because she has not clearly identified the specific employment practice that she is challenging, nor has she provided evidence of any practice she intends to challenge. All that appears from the record is that at some point in the past—it is not clear when—some PennDOT employees were told that they could not use public restrooms in certain circumstances. But it is undisputed that as of October 2016, Campanaro informed Berger via a "Counseling Session document" that she could use any public restroom, provided that she notified her foreman that she was temporarily "out of service." Accordingly, any policy that might have existed in the past concerning the use of public restrooms no longer exists or, at the very least, is no longer enforced against Berger, such that there is no practice for this Court to enjoin.

**E. PennDOT is entitled to summary judgment on Berger's claims of disability discrimination.**

PennDOT contends that Berger cannot establish a disability discrimination claim under the Rehabilitation Act for several reasons. First, with respect to Berger's reasonable accommodation claim, PennDOT contends that she cannot establish that her diverticulitis or Lyme disease qualifies as a disability, nor did she ever request an accommodation for these conditions. With respect to her retaliation claim, PennDOT contends that, even if she can show that she had a disability, she cannot show that she suffered an adverse employment action as a result.

Berger responds that her diverticulitis and Lyme disease are disabilities and that she informed PennDOT in July 2014 that she had a "major problem" concerning her use of the bathroom, but PennDOT did not follow up with any questions in response. She also contends

that she provided PennDOT with a physician's letter in August 2014 concerning her condition and her need to take frequent bathroom stops. With respect to her retaliation claim, Berger contends that she was "counseled, suspended without pay and terminated for exercising her protected right to request reasonable accommodations." Pl.'s Br. Opp'n 61.

With respect to Berger's accommodation claims, "[t]he standards set forth in the Americans with Disabilities Act are to be used in evaluating accommodation claims under the Rehabilitation Act." *See Boandl v. Geithner*, 752 F. Supp. 2d 540, 558 (E.D. Pa. 2010) (citing 29 U.S.C. § 794(d)). Under the ADA, "an employer discriminates against a qualified individual with a disability when the employer does not make reasonable accommodations to the known physical or mental limitations of the individual unless the employer can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the employer." *Taylor v. Phoenixville School Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) (citing 42 U.S.C. § 12112(b)(5)(A)). An employer must "initiate an informal, interactive process with the employee in need of an accommodation" to determine "the precise limitations resulting from the disability and the potential reasonable accommodations that could overcome those limitations." *Taylor*, 184 F.3d at 311–312. "An employee can demonstrate that an employer breached its duty to provide reasonable accommodations because it failed to engage in good faith in the interactive process by showing that: (1) the employer knew about the employee's disability; (2) the employee requested accommodations or assistance for his or her disability; (3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and (4) the employee could have been reasonably accommodated but for the employer's lack of good faith." *Colwell v. Rite Aid Corp.*, 602 F.3d 495, 504 (3d Cir. 2010).

Berger's reasonable accommodation claim fails because she has not shown that she requested an accommodation. Berger's August 2014 physician's note reads in pertinent part as follows:

> The patient suffers from severe diverticulitis and chronic Lyme disease. As you know, the patient requires to make [sic] numerous bathroom stops and every now and then she gets a little confused when she reads small parts of paperwork. She needs increased time to do that.

Pl.'s Resp. Ex. 49, ECF No. 35-19. It is unclear from the letter what sort of accommodation, if any, is being requested. Further, as PennDOT observes, this letter is dated two days after Berger was suspended, and it is undisputed that Berger did not otherwise request an accommodation when she returned from suspension. Therefore, Berger cannot prevail on her reasonable accommodation claim.

With respect to Berger's retaliation claim, "[j]ust as the Rehabilitation Act borrows the ADA's standards for accommodation claims, it borrows as well the ADA framework for retaliation claims." *Boandl*, 752 F. Supp. 2d at 561. In short, to establish a prima facie case of retaliation under the Rehabilitation Act, the plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity; and (3) a causal connection between the employee's protected activity and the employer's adverse action. *See id.*

Under the first element, a "protected activity" "includes (a) opposition to a practice made unlawful under the ADA or (b) participation in an ADA investigation, proceeding or hearing by making a charge, testifying or otherwise assisting." *See Merit v. Se. Pennsylvania Transit Auth.*, 315 F. Supp. 2d 689, 704 (E.D. Pa. 2004). Further, "[r]equesting an accommodation is a protected activity for purposes of the ADA's anti-retaliation provision." *Brown v. Vanguard Grp., Inc.*, No. CV 16-946, 2017 WL 412802, at *16 (E.D. Pa. Jan. 30, 2017).

Under the second element, an "adverse action" in this context is one that a "reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (internal quotation marks omitted). The standard requires *material* adversity in order to "separate significant from trivial harms." *See id.*

Under these standards, Berger's claim fails for at least two reasons. First, she cannot show that her request for clarification of the bathroom policy was "protected activity" under the Rehabilitation Act. The undisputed facts show that Berger requested a list of approved bathroom locations from Campanaro because she was "tired of looking over her shoulder." There is no indication that Berger or Campanaro connected this request with Berger's disabilities. Second, even if Berger's request were protected activity, she did not suffer a materially adverse action as a result of this activity. The only action that was connected with Berger's inquiry was when Campanaro gave her the "Counseling Session document" in October 2016. As described above, the Counseling Session document contains an admonition that "any future incidents of this nature, or of a similar nature, may result in disciplinary action." Based on the record before the Court, it may appear inappropriate and illogical for an employer to issue such a warning in response to a simple request for a list of places to use the bathroom. Nevertheless, the Court cannot conclude that providing the Counseling Session document was a "materially adverse" action. *See Sconfienza v. Verizon Pennsylvania Inc.*, 307 F. App'x 619, 622 (3d Cir. 2008) (holding that "a warning about future penalties, which had no adverse impact on [the plaintiff's] employment, did not affect her compensation, and did not impede her ability to receive a transfer or promotion" did not constitute a materially adverse action). Accordingly, even if Berger could

satisfy the first element of a retaliation claim, she is unable to satisfy the second element, and her claim fails.

**V.      Conclusion**

For the reasons set forth above, PennDOT is granted summary judgment on each of Berger's claims. A separate order follows.

BY THE COURT:

_/s/ Joseph F. Leeson, Jr._____
JOSEPH F. LEESON, JR.
United States District Judge